[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Morton Builders, Inc., (Morton) is appealing, pursuant to Conn. Gen. Stat. 12-422, from the ruling of the defendant Commissioner of Revenue Services denying plaintiff's application for refund of use taxes paid by the plaintiff during the period July, 1984 through May, 1987.
The parties have stipulated to the following facts:
1. Plaintiff, Morton Buildings, Inc. (Morton), is a corporation organized and existing under the laws of the State of Illinois. Morton has its principal offices in Morton, Illinois and is licensed to do business in Connecticut.
2. Defendant, Timothy F. Bannon, was the duly authorized Commissioner of Revenue Services for the State of Connecticut at the time this appeal was brought, and it is agreed that "Defendant" may be used interchangeably to mean his successor(s) and agents, including employees acting under the Commissioner's authority at the Connecticut Department of Revenue Services (the "Department of Revenue").
3. Application for refund of use taxes for the period July 1984 through May 1987:
a) During the period July 1984 through May 1987 (the "First Tax Period"), Morton timely filed Sales and Use Tax Returns on Form OS-114 with the Department of Revenue for each month during the First Tax Period and timely paid use taxes to the Department of Revenue in the aggregate amount of $163,180.39.
b) On August 27, 1987, Morton timely filed an Application for Refund of Use Taxes with the Department of Revenue for a refund of use taxes paid during the First Tax Period in the amount of $163,180.39 (the "First Refund Request"). The First Refund Request contained a claim for refund of all use taxes paid during the First Tax Period on the CT Page 6438 ground that the purchases on which those taxes were paid were not subject to use tax.
c) By letter dated September 17, 1987, Defendant denied Morton's First Refund Request.
d) By letter dated October 12, 1987, Morton timely petitioned Defendant for a formal hearing on its denial of the First Refund Request.
e) By letter dated February 25, 1988, Defendant denied Morton's request for a formal hearing on Defendant's denial of Morton's First Refund Request and advised Morton that any further appeal must be made under 12-422 of the Connecticut General Statutes ("12-422").
f) On March 24, 1988, Morton timely filed an appeal under 12-422 from Defendant's denial of the First Refund Request.
4. Application for refund of use taxes for the period June 1987 through December 1987:
a) During the period June 1987 through December 1987 (the "Second Tax Period"), Morton timely filed Sales and Use Tax Returns on Form OS-114 with the Department of Revenue for each month during the Second Tax Period and timely paid use taxes to the Department of Revenue in the aggregate amount of $57,402.44.
b) On October 21, 1988, Morton timely filed an Application for Refund of Use Taxes with the Department of Revenue for a refund of use taxes paid during the Second Tax Period in the amount of $57,402.44 (the "Second Refund Request"). The Second Refund Request is founded upon the same legal and factual bases as those grounding Morton's First Refund Request.
c) By letter dated October 25, 1988, defendant denied Morton's Second Refund Request and notified Morton that the Second Refund Request would be forwarded by Defendant to its Appellate Unit to be considered in connection with Morton's appeal of Defendant's denial of the first Refund Request.
5. Deficiency Assessment for additional use taxes for the period October 1984 through November 1987:
a) Approximately one month after Morton filed its First Refund Request, Defendant authored an internal CT Page 6439 memorandum dated September 22, 1987 addressed to its Tax Division Chief which stated that Morton's First Refund Request had been denied and recommended an "investigation. . . to determine whether a full scale audit is needed.
b) Following an audit, Defendant issued a deficiency assessment to Morton dated February 1, 1988 for additional use taxes during the period October 1984 through November 1987 in the amount of $31,506.33.
c) Morton timely protested the deficiency assessment and by letter dated February 28, 1988, Defendant notified Morton that it had received that protest and that Morton's account had been placed on "hold."
d) Following informal conferences between Defendant's counsel and Morton's counsel, defendant reduced the deficiency assessment to $14,591.00 plus interest of $4,740.43, in the aggregate amount of $19,331.43 (the "Deficiency Assessment"). On or about March 14, 1989, Morton paid the deficiency assessment to Defendant, under protest, reserving all rights to dispute the Deficiency Assessment on the legal and factual bases grounding Morton's on-going appeal pursuant to 12-422.
6. On December 31, 1988, Morton filed, pursuant to12-422, an Amended and Substituted Complaint (the "Complaint") to consolidate Morton's appeal of Defendant's denial of the First Refund Request ($163,180.39), Defendant's denial of the Second Refund request $57,402.44) and Defendant's issuance of the Deficiency Assessment ($19,331.43) in the total amount of $239,914.26.
Morton's Complaint also seeks prospective relief in the form of a refund of use taxes paid by Morton from January 1, 1988 through the date of judgment herein.
8. Morton has continued to timely file Sales and Use Tax Returns on Form OS-114 and to timely pay use taxes to the Department of Revenue.
9. The parties agree that 16.6124% of the use taxes paid by Morton during the First Tax Period and the Second Tax Period related to windows, doors, hardware and those raw materials that are incorporated into Morton buildings that were purchased outside Connecticut in their final form and not made by Morton. Therefore, Morton claims a refund of only 83.3876% of the amount of its First Refund Request, Second Refund Request, and the Deficiency Assessment. CT Page 6440
10. With respect to any Court determination entitling Morton to a refund of use taxes paid, and all interest paid thereon by Morton, Defendant is to pay interest to Morton as allowed by statute, such interest accruing from the date such use tax and interest was paid by Morton through the date the refund is paid by the Department of revenue.
11. The determination by the Court with respect to the refund claims made herein shall be dispositive in like manner with respect to any refund claims and use tax payments by Morton for later periods that are not included in this action.
12. Nothing in paragraph 10 and 11 shall be construed as a waiver by either party of their right to appeal or petition the determination or decision by the Superior Court, and the Defendant's obligation to refund any use taxes found due shall arise 60 days from final determination.
13. Morton has exhausted its administrative remedies and this appeal is properly before the Court pursuant to12-422.
14. Morton is engaged in the production, sale and installation of prefabricated timber-frame, metal-sheathed warehouses and other buildings for use by farm and industry. Morton performs no activities in Connecticut other than solicitations of sales by its salesman, certain limited advertising in local media and the assembling of building components made by Morton out-of-state, on the customer's site. There are no sales of Morton buildings or the building components through or to lumber yards, dealers or other retailers. Morton does not sell the building components in the regular course of its business.
15. The overall style of the buildings made by Morton is uniform, but the various features such as doors, and windows and skylights may be specifically ordered and the dimensions of the building itself may be varied to suit the purchaser's needs.
16. Morton purchases all of the raw materials used in its business in bulk outside of Connecticut and stores them in its own warehouses at various locations outside Connecticut. The principal raw materials include, among others, steel and lumber. The raw materials are not purchased for application to any particular customer order, either within or without Connecticut.
17. Morton reported and paid use tax upon the raw CT Page 6441 materials used in its factories to make building components and hardware out-of-state which building components were incorporated by Morton in buildings assembled in Connecticut.
18. Morton purchases all of the raw materials used to produce the building components in advance, based on generalized business projections.
19. Morton has several factories, all of which are located outside Connecticut. At these factories, Morton produces from raw materials the building components and most of the hardware used in installing buildings. Morton does not maintain or operate any factories in Connecticut. As noted in paragraphs 9 and 11 hereof, other raw materials are not subjected to any production process by Morton and are included within the 16.6124% of use taxes as to which Morton does not seek a refund herein.
20. When Morton receives an order, the necessary raw materials are withdrawn from storage and made into various building components and hardware in accordance with the customer's specifications and in the manner described in paragraphs 22 through 28 hereof. The production processes performed by Morton in each of its various out-of-state factories are uniform.
21. The building components that are made by Morton include components such as trusses (the "Trusses"), lower columns (the "Lower Columns"), upper Columns (the "Upper Columns"), purlins (the "Purlins"), metal panels (the "Metal Panels") and overhang rafters (the "Overhang Rafters"). The production processes performed by Morton with respect to each of those building components are briefly described below.
22. To make the Trusses, the upper chords and lower chords that will form the Truss are run through a machine which cuts the chords to the proper lengths and to the proper angles at both ends of each chord. Lumber webbing, which is attached between the upper and lower chords, is also cut to length and to the correct angles. The Trusses (chords and webs) are then transferred to a fixture table where they are positioned "face-up" and metal gusset plates, themselves made by Morton, are positioned at each joint. The gusset plates are then stitched into position with a pneumatic gun nailer. The Truss is then repositioned "face-down" and additional metal gusset plates are positioned onto the joints on that side of the Truss. The Truss is then positioned onto a conveyer and transported through a roller press machine. The roller press machine imbeds the metal gusset plates into the wooden chords and webs at the pre-selected positions. The trusses include CT Page 6442 end Trusses and intermediate Trusses.
23. To make the Lower Columns, Morton utilizes lumber which is preservative treated. The lumber is trimmed to length as required. The lumber is then run through Morton's column machine, a computerized production process, which indexes the lumber to various prepositioned locations and clamps it from the top and side. While clamped, nails are driven into the column lumber at prescribed angles. The laminating process (indexing, clamping, and nailing) is repeated until the column is completed. The Lower Columns then proceed to the drilling station and holes are drilled through the bottom of the Lower Columns at the prescribed locations.
24. To make the Upper Columns, Morton cuts the lumber to length and cuts the ends of lumber to the prescribed angles. The lumber is then run through Morton's column machine which indexes the lumber to various prepositioned stops as part of the computerized production process. The same laminating process (indexing, clamping, and nailing) is used for the Upper Columns then are affixed with 2-inch by 2-inch blocks on the outside of the Upper Columns. When assembled together, the upper columns and lower columns form the main support, sidewell, structural, corner and end columns (collectively, the "Columns").
25. To make the Purlins, Morton feeds the lumber through a machine which cuts each end of the lumber to the correct length, and squares the ends of the lumber. Thereafter, metal connector plates, also made by Morton, are positioned at each end of the Purlin and are pressed into position. At the same time during the production process, holes are drilled into the Purlins at prepositioned locations so that the Purlins may be readily assembled to the Truss at the site. Morton also makes wind ties (the "Wind Ties"), which in most cases are produced utilizing the same process as the Purlins.
26. To make the Metal Panels, Morton purchases coils of galvanized cold-rolled steel which are shipped to an independent contractor outside Connecticut for application of coatings to the steel. The rolled steel, with applied coatings is then delivered to Morton's factories. When a factory receives an order, it makes the required interior and exterior metal Panels by processing the rolled steel through a machine that rolls channels into the steel to add strength and then cuts the steel to specific lengths according to the requirements of the particular order. With the application of different paints and made in varying sizes, the metal Panels are used for a variety of purposes including, inter alia, CT Page 6443 exterior sheeting, sidewalls and roof panels.
27. To make the Overhang Rafters, Morton utilizes a production process essentially similar to that employed in making the Trusses. Anywhere between 2 and 6 pieces of lumber are cut to the proper lengths, and are cut to the proper angles at the ends of each pieces of lumber. The overhang Rafter is then transferred to a fixture table where it is positioned "face-up" and metal gusset plates, made by Morton, are positioned at the various joints. The metal gusset plates are then stitched into position with a pneumatic gun nailer. The Overhang Rafters are then repositioned "face-Down" and metal gusset plates are positioned onto the joints on that side of the Overhang Rafters. The Overhang Rafter is then positioned onto a conveyor and transported through a roller press machine which imbeds the metal gusset plates into the wooden members.
28. Morton produces some of the hardware for the buildings at its factory in Goodfield, Illinois. Morton uses a variety of metal working machines to make the required hardware components.
29. The production processes to make the building components takes place entirely outside of Connecticut prior to the transport of the finished building components into Connecticut for installation at customer sites.
30. Morton purchases windows, some doors and some hardware from suppliers outside of Connecticut rather than making them. As set forth in paragraph 9 hereof, these items are included in the 16.6124% of use tax as to which Morton does not seek a refund as Morton purchases them in final form.
31. In a few cases, Morton may purchase windows and doors from suppliers in Connecticut. When Morton makes such purchases in Connecticut, it pays sales taxes on the purchases. Morton has not sought nor does it seek a refund of-any of those sales taxes.
32. After completion of the production process the Building Components made by Morton, and the other materials, are transported by Morton to the building site in Connecticut. Morton employees assemble the building components into the finished building at the customer's site. In a typical project, the crew will unload the building components made by Morton, dig the holes for the Columns that support the building and pour concrete into the holes to form the building's foundation, install the Lower and Upper Columns, install the Trusses and overhang Rafters, install the Metal Panels for the sidewalls, install the Metal Panels for the roof, and finish CT Page 6444 the building with the installation of hardware, windows, and doors.
33. All of the transportation, loading, unloading and installation labor is performed by Morton's employees,
34. Morton building models typically run between seventy-two feet to seventy-five feet in length. Generally, it takes Morton's crew four to five days to complete the installation of a building.
35. All three members of Morton's crew, — and the use of lifting equipment, are frequently required during the installation of the building by virtue of the sheer weight and bulk of various of the building components. For example, the Trusses run between 18 and 81 foot clear span and arrive at the site of the building in one piece.
36. The design and subsequent production of Morton's building components must be within approximately one-eighth to one-half inch of being "square" in order to properly fit together during the installation of the building on site.
37. The assembly and installation of a building by Morton is a "turnkey" project and a permanent improvement to real property in Connecticut for sales and use tax purposes as the contract between Morton and its Customers provides for Morton to deliver, install and affix a completed building to the customer's building site at a lump sum price.
The issue in this case is whether the materials used by the plaintiff to construct warehouses in Connecticut come within the stricture of 12-411 of the Connecticut General Statutes and are thus subject to the Use Tax. Section 12-411
establishes three conditions for the imposition of the use tax to tangible personal property:
 (1) The item of "tangible personal property" must be stored, accepted, consumed or used in Connecticut;
 (2) That item if tangible personal property must have been "purchased" from a retailer; and
 (3) The purchase of the item of personal property must have been for "use" in Connecticut.
It is the Plaintiff's contention that raw materials CT Page 6445 purchased by it from out-of-state suppliers, are stored, consumed and used totally outside of Connecticut, and that these raw materials are stored by the plaintiff in its own warehouses outside of Connecticut; and that these raw materials are used in the production process to make building components, which production process takes place entirely outside of Connecticut. The plaintiff contends that the production process which it utilizes at its out-of-state factories to manufacture the building components consumes and transforms the raw materials into new and tangible personal property i.e., the building components.
What the plaintiff refers to as raw materials are sheets of lumber and rolls of steel which are pre-cut and pre-assembled at plaintiff's out-of-state facility and assembled as a building on the customer's site. The steel is used for the building's exterior sheeting, sidewalls and roof. The lumber is used for the building's framework and interior.
The plaintiff argues that the cutting, grooving and laminating of the steel rolls and the cutting and framing of the lumber change the steel and lumber from raw materials to building components, which when brought into Connecticut are items of personal property not subject to Connecticut's Use Tax.
The defendant argues the pre-cut, grooved and laminated steel together with the pre-cut framed lumber are raw materials used to construct the building which the plaintiff puts up on the customer's prepared building site. The whole operation carried on by the plaintiff is a turn-key operation.
The following Connecticut Agencies Regulations12-426-11b is relevant.
 (a) Definitions. Section 12-426-11b.
Machinery, materials, food and fuel.
 (7) "Industrial plant" shall mean a manufacturing facility at which a manufacturing production process is occurring . . . .
 (8) "Machinery" shall mean the basic machine itself, including all of its component parts and contrivances, such as belts, pulleys, shafts, moving parts, operating structures and all equipment or devices used or required to control regulate or operate the machinery, but excluding off ice equipment or data processing equipment CT Page 6446 other than numerically controlled machinery used directly in the manufacturing process. "Machinery" does not include accessory tools, hand tools, and implements.
 (9) "Machinery used in manufacturing or agricultural production" shall mean a device composed of solid, fluid, and/or electrical parts assembled into a unit for the purpose of transmitting forces, motion and energy in such a manner as to accomplish a necessary operation in a manufacturing production process or in an agricultural production process.
 (10) "Manufacturing" shall mean the performance as a business of an integrated series of operations which places personal property in a form, composition or character different from that in which it was acquired for sale in the regular course of business by the manufacturer. The change in form, composition, or character must be a substantial change, and it must result in a transformation of property into a different product having a distinctive name, nature and use. Operations such as compounding or fabricating are illustrative of the types of operation which may result in such a change. "Manufacturing" is an activity which shall occur solely at an industrial plant.
 (11) "Manufacturing production process" shall mean any one of a series of production activities, beginning with the movement of the raw materials after their receipt, inspection and storage, to the first production machine and ending with the completion of the finished product, including any packaging operations for its sale to the ultimate consumer. "Manufacturing production process" shall not include any activities prior to the first production stage (such as collecting, weighing and storing raw materials) or any activities following the last production stage (such as casing, loading or delivering to the consumer). "Manufacturing production process" shall occur solely at an industrial plant.
 Conn. Gen. Stat. 12-411 (1) provides for a Use Tax in Pertinent part as follows:
 Imposition and rate. An excise tax is hereby imposed on the storage, acceptance, consumption or any other use in this state of tangible personal property purchased from any retailer for storage, acceptance, consumption or any other use in this state. CT Page 6447
In applying this section to tangible personal property brought into the state, Conn. Gen. Stat. 12-411 (13) provides that it will be presumed that the property was purchased for use in this state:
 Presumption of purchases from retailer. It shall be presumed that tangible personal property shipped or brought to this state by the purchaser was purchased from a retailer for storage, use or other consumption in this state.
The use tax is complementary to the sales tax imposed by Conn. Genn. Stat. 12-408 (1) on the sale of tangible personal property, and the consumer's liability to pay the use tax is only extinguished by a receipt from the retailer showing that the sales tax has been paid to the retailer. Conn. Gen. Stat.12-411 (2).
With respect to the building industry in general, the Commissioner has promulgated Conn. Agencies Regs. 12-426-18
detailing the interplay of the two taxes. Specifically concerning the prefabricated building industry, the Commissioner has issued Policy Statement, 90-2 Modular Home Units, ("Policy Statement").
The first inquiry which the Commissioner must make under the Policy Statement is as to the nature of the underlying transaction. If the builder is under a contract obligation to deliver the building to the site and not to perform any connecting, affixing or finishing services, the contract is one for sale of tangible personal property. Sales and use tax is due on the full amount of the sales price. In such cases, the builder is considered a manufacturer of tangible personal property. The material used to construct the building is exempt from the sales and use tax pursuant to Conn. Gen. Stat.12-412 (18), as ingredients or component parts of tangible personal property manufactured for sale.
If the contract requires the builder to turn over to its customer a building installed or permanently affixed to the land or foundation, the contract is a contract for the improvement to real property and the builder is a contractor. This contractor-builder is not liable under Conn. Gen. Stat.12-408 for a sales and use tax on the total contract sale price because there is no sale of tangible personal property. Instead, the contractor-builder is liable for the sales and use tax on the material used and consumed to fulfill his contract to improve real property. The sales tax would be applicable to material purchased in Connecticut and the use tax would be applicable to material purchased out-of-state. CT Page 6448
In American Frozen Foods, Inc. v. Dubno, Super. Ct. No. 301353 (J.D. Hartford-New Britain, April 30, 1987), the court held that to fall within the definition of "manufacturing" as set forth in Connecticut Agencies Regulations 12-426-11b(a)(10), the plaintiff must establish (1) it is involved in the performance as a business of an integrated series of operations which places personal property in a form, composition or character different from that in which it was acquired for sale; (2) the change in form, composition or character is a substantial change; (3) this change results in a transformation of property into a different product having a distinctive name, nature and use; and (4) this activity occurs solely at an industrial plant.
The plaintiff cites us to Morton Building, Inc. v. Chu, 510 N.Y.S.2d 320 (1987) which it contends is on all fours with the instant case. In Morton the court states: "By its nature manufacturing results in raw material losing their identity . . . manufacturing is . . . the production of tangible personal property that has a different identity from its ingredients. The Morton court then goes on to find that the petitioner Morton buys raw material in bulk outside of New York and stores raw materials in warehouses at various locations but not in New York, that the petitioner ships the building components to the customers' sites, including sites in New York, and erects buildings on land prepared by the customers. The New York court agreed with the petitioner, Morton Buildings, Inc. who insisted that the raw materials were wholly consumed and transformed during the manufacturing process and that it was the finished product, the components which were affixed to the real property.
The sole question to be answered in the instant case is whether the rolls of steel and the lumber, which Morton buys outside of Connecticut are so changed and transformed before they come into Connecticut as to preclude their being tangible personal property subject to the use tax. We do not agree with the New York court that the process of taking the roles of steel, cutting them to size, grooving them and laminating them preparatory to using them to form the exterior portion of the warehouse does in fact change its identity. Nor does the cutting of the lumber to specific sizes and framing it change its identity.
A similar question presented itself in Forox Corporation v. John G. Groppo, Commissioner of Transportation, 24 Conn. App. 72
(1991). In that case it was found that unexposed filmstrip which is cut and mounted onto slides is not transformed into a different product substantially changed in CT Page 6449 form, composition or character. At the end of the process the Forox court found it was still film. So too when the steel and lumber are cut to size we still have steel and lumber. Thus, we find that what comes into Connecticut is steel and lumber in its original identifiable form for use in the construction or warehouses on customers' sites. As such it is tangible personal property subject to Connecticut's Use Tax.
Judgment may enter in favor of the defendant as to counts one and two.
M. HENNESSEY, J.